Rockingham,
No. 5064.

ROBERT A. SAYERS *v.* RALSTON TREE SERVICE.

Argued February 5, 1963.

Decided March 29, 1963.

434

*Charles F. Hartnett* (by brief and orally), for the plaintiff.

*Burns, Bryant & Hinchey* and *Joseph P. Nadeau* (*Mr. Nadeau* orally), for the defendant.

DUNCAN, J. This is a common-law action brought against a third party tort-feasor to recover damages for personal injury

suffered by an employee of the city of Haverhill in consequence of which the city paid the employee workmen's compensation pursuant to the Massachusetts Workmen's Compensation Law. Mass. G. L., c. 152. Section 15 of the statute provides in part as follows: "When the injury for which compensation is payable was caused under circumstances creating a legal liability in some person other than the insured to pay damages in respect thereof, the employee may at his option proceed either at law against that person to recover damages or against the insurer for compensation under this chapter, but, except as hereinafter provided, not against both. If compensation be paid under this chapter, the insurer may enforce, in the name of the employee or in its own name and for its own benefit, the liability of such other person, and if, in any case where the employee has claimed or received compensation within six months of the injury, the insurer does not proceed to enforce such liability within a period of nine months after said injury, the employee may so proceed. In either event the sum recovered shall be for the benefit of the insurer unless such sum is greater than that paid by it to the employee. If the insurer brings the action four fifths of the excess shall be paid to the employee, and if the employee brings the action he shall retain the entire excess." Mass. G. L., c. 152, s. 15.

As early as May 1958, steps were taken by the employer city looking to enforcement of the defendant's liability for the accident of March 12, 1958 under the foregoing statutory provisions. The matter was referred to the Haverhill city solicitor, and in turn to New Hampshire counsel. Suit in the name of the employee Sayers was instituted in Rockingham County Superior Court by writ dated January 14, 1959.

At the trial the defendant moved that the city of Haverhill "be named and added" as a party plaintiff, and likewise moved to dismiss the action on the ground that it was brought by the city after the expiration of nine months from the date of injury. The motion to add the city as a party plaintiff was denied, although it was "found and ruled . . . that the City of Haverhill is a party in interest." After hearing, in part before the jury and in part without the jury, the Trial Court denied the defendant's motion to dismiss grounded upon the contention that the city was barred by the statute from recovery. In support of its exceptions the defendant relies upon language of the court in *Employers Mutual Liability Ins. Co.* v. *Ford Motor Co.*, 335 Mass. 504,

507-508, to the effect that after the nine-month period the employee "alone has the right to bring the action" against the third party, and construing "the nine month period as a limitation on the right of the insurer to bring the third party action." As the cited case is understood, it stands for the proposition that a compensation insurer is not entitled to declaratory relief against a third party tort-feasor when no action has been brought within the nine-month period fixed by the compensation statute. It is not controlling of the case before us.

Under the Massachusetts law, the authority of the plaintiff to maintain a common-law action against a third party is a preliminary question for the judge, whether the action is by the injured employee (*Nealon, petitioner,* 334 Mass. 213, 218) or by the insurer in the name of the employee. *Murray* v. *Rossmeisl,* 284 Mass. 263, 267; *Hobart* v. *O'Brien,* 243 F. 2d 735, 740 (1st Cir. 1957). In the case before us the preliminary question presented by the defendant's motion was properly determined by the judge, upon evidence which warranted the finding and ruling made.

Furthermore, the issue is one not available to the defendant as a defense, so long as it will be protected against double recovery, as will this defendant. *Dreher* v. *Bedford Realty Company Inc.,* 335 Mass. 385, was decided a month before the *Employers* case, *supra,* relied upon by the defendant. It was a common-law action against a third party defendant brought by the compensation insurer in the name of the injured employee after she had accepted compensation and twenty-one months after the injury. As a part of a compensation settlement made more than sixteen months after the suit was brought, the insurer had relinquished its interest in the pending action to the employee. Evidence of these facts was held to have been properly withdrawn from consideration by the jury. The Court held that the insurer's conduct "was of no concern to the [third party] defendant, but was entirely a matter between the insurer and the injured employee" and concluded: "Here the defendant . . . should not be permitted to defeat or diminish the recovery against it by showing negotiations between the insurer and the injured employee . . . A contrary holding would result in conferring a windfall upon the third party wrongdoer." *Id.,* 391, 392. We conclude that the defendant's motions to dismiss upon the ground ꞏꞏꞏ the action was brought by the city were properly denied. *Hobart* v. *O'Brien,* 243 F. 2d 735 (1st

Cir. 1957) *supra*. See also, *Becker* v. *Eastern Massachusetts Street Ry.*, 279 Mass. 435; *West* v. *Molders Foundry Co.*, 342 Mass. 8.

The defendant's motions for nonsuit and directed verdict upon the ground that there was no evidence of the defendant's negligence and that the plaintiff was contributorily negligent as a matter of law were also properly denied. The evidence indicated that the defendant was engaged by the Haverhill Electric Company to cut down a dead elm tree in Haverhill. On March 12, 1958 three employees of the defendant and three employees of the city, including the plaintiff, converged upon the scene of the accident. Pending the arrival of the Ralston crew the city crew which arrived first, engaged in trimming a maple tree some seventy-five feet away from the elm in question. So far as removal of the elm was concerned the function of the city crew was to remove debris.

The evidence was conflicting as to whether the general practice was to remove a severed limb from beneath the tree before the cutting of a second limb proceeded, and as to whether the city crew was to take debris from beneath the tree, or to wait until it had been moved out from under the tree by the Ralston crew. In any event, one of the lower limbs was cut from the elm and lowered to the ground without incident, and a Ralston employee using a power saw proceeded to trim the brush from the outer end of the severed limb. While this was being done, the plaintiff remained at the rear of a city truck which was parked near the maple tree about seventy-five feet south of the elm on the same side of the street.

After the first limb had been lowered to the ground and partially trimmed off, and while Cloutier, the Ralston "topper," was rigging the ropes preparatory to removing a second limb some thirty feet above the ground and two feet above where the first limb had been cut, the plaintiff advanced with a power saw to the first limb lying in the street. Cormier, a second employee of the defendant, was then standing in the street near the fallen limb, holding the lowering rope which Cloutier, in the tree, was placing for removal of the second limb. Hardy, the third employee of the defendant, was then standing upon the sidewalk, facing toward Cormier, with the fallen limb between them, and both he and Cormier were engaged in watching Cloutier.

Cloutier testified that it took him about ten minutes to rig the ropes before he commenced to saw on the second limb which

extended directly above the limb in the street. He then proceeded with a hand saw to cut the second limb from the tree, and had been sawing for about four minutes when the limb broke and fell to the ground, striking the plaintiff in the back.

Beauvais, the plaintiff's foreman who was engaged in trimming the maple, instructed the plaintiff "to go up and cut them limbs so that we could get them out of the way and load them in this truck, that was part of our job." The plaintiff testified that when he started with his power saw toward the limb in the street Cloutier was rigging the second limb. When he arrived at the fallen limb, the plaintiff again looked up at Cloutier and saw that he was tying the rope to the second limb. The plaintiff started his power saw and commenced to cut the limb in the street, bending over it. He had been sawing for about four minutes and possibly had started a second cut, when the second limb fell upon him. On cross-examination he testified he was not sure of the length of time that he had been sawing, that it could have been a matter of a few seconds, and again that it was "two or three minutes."

Cormier, who was holding the lowering rope, stood a few feet away from the fallen limb when Sayers commenced to saw on it. He testified that Sayers was sawing "about two minutes" before the limb fell. As the plaintiff was sawing, the slack end of the lowering rope lay in the street under the fallen limb, in the vicinity of where the plaintiff was cutting. Cormier let go of the holding rope with his right hand in an effort to pull the slack away from where Sayers was working, "three or four feet away," and as he did so the second limb broke. Because Cormier had the rope with only one hand, he was unable to hold the limb from falling upon Sayers. Any shouted warning to Sayers at that time would have been useless because of the noise of his power saw.

Cloutier, the "topper," who was also the defendant's foreman, testified that while he was rigging the second limb he looked toward the south four or five times and that when he last saw Sayers he was standing at the rear of the city truck "at least twenty-five feet" away from the elm tree. He testified that when he commenced to cut the second limb with his hand saw, there was no one beneath the limb; and that he sawed for three or four minutes before he heard Sayers' power saw commence to operate. Although he testified that "the minute I heard the power saw start I stopped sawing," he conceded that on deposition he had

said he "kept on sawing for ten or fifteen seconds after the power saw started." The questions and answers on deposition to which he thus referred, and which he testified were "true," were as follows: "Q. All right, let's see. Page 43, question 396 and following. '396. And then how long a period of time went by from the time you first heard the power saw until the limb broke and fell? It was very shortly afterward, I wasn't half way through the limb. I heard the power saw going, I stopped sawing, right then and there it broke.' That is the question and answer you gave? A. Yes. Q. '397. Would it be a matter of half a minute? No, it would be less than that. 398. Ten or fifteen seconds? Just about.' Aren't those the questions and answers you gave in your deposition? A. Yes."

Both Cloutier and Cormier conceded that they had a duty to warn anyone beneath the second limb while it was being sawed, and there was evidence that custom required that the topper wait until the limb on the ground was cut up before commencing to cut a second limb.

The defendant's argument that its employees were under no duty to warn the plaintiff if he took a position under the second limb while Cloutier was sawing it is based upon a hypothesis which the jury did not have to accept. Its argument that it was error to submit the issue of the defendant's failure to warn, and the issue of Cloutier's negligence in "sawing off the limb at the time and in the manner in which he did" is likewise based upon the erroneous assumption that there was no evidence that the plaintiff commenced to saw before Cloutier did. The jury could find that all of the defendant's employees were in a position to take saving action, and that all of them negligently failed to do so. The issues of the negligence of the defendant's employees, and of the contributory negligence of the plaintiff were clearly issues for the jury, to be determined upon the entire testimony. *Zielinski* v. *Cornwell*, 100 N. H. 34; *Chamberlain* v. *Palmer Lumber Co.*, 104 N. H. 221.

The defendant excepted to submission to the jury of the issue of the last clear chance upon the ground that it "is not applicable to the facts of this case," and because "the Court failed to instruct the jury in order for them to apply the last clear chance doctrine they must find that if it had been applied that the accident would have been avoided." The defendant also excepted to the Court's refusal to charge in accordance with one of its requests upon the

emergency doctrine as applied to the conduct of Cormier.

The Court instructed the jury upon the doctrine of the last clear chance in accordance with the law of this jurisdiction as set forth in *Clark* v. *Railroad,* 87 N. H. 36, 38-39, and subsequent cases. The doctrine of the last clear chance, as such, is not a part of the law of Massachusetts where the accident occurred, but such a situation is there treated as a matter of causation. *Gregory* v. *Maine Central Railroad,* 317 Mass. 636, 643. Since counsel for both parties were evidently content to rely upon the presumption that the common law of Massachusetts was the same as that of New Hampshire in the absence of proof to the contrary (*Saloshin* v. *Houle,* 85 N. H. 126; *Lynch* v. *Grundy,* 97 N. H. 286) the New Hampshire law became the law of the trial. *Zielinski* v. *Cornwell,* 100 N. H. 34, *supra.* The evidence in the case was such that the doctrine could properly be submitted to the jury. While Cloutier denied having seen the plaintiff under the limb which he was cutting, and Cormier and Hardy denied seeing him there in season to warn him, all three were in a position to have seen him and to have acted for his protection. Although Cloutier denied any knowledge of the plaintiff's position under the limb, he testified to looking in his direction before he started to cut the second limb, and to having looked beneath the limb as he commenced to saw. If the jury found that the plaintiff was operating his power saw before Cloutier commenced to saw the second limb of the tree, it could also find that Cloutier was actually aware of the plaintiff's predicament even though he denied it. To be entitled to the benefit of the doctrine of last clear chance, the plaintiff was not obliged to establish by direct testimony that Cloutier was aware of the plaintiff's ignorance of his peril. *Hamlin* v. *Roundy,* 96 N. H. 123; *Clark* v. *Railroad, supra,* 87 N. H. 36, 39. If the jury found that Cloutier was aware of the plaintiff's peril and of his ignorance of it, it could like-wise find, contrary to the defendant's argument, that he had the last clear chance to avoid the accident, merely by delaying his cutting operation until the plaintiff could be warned. Similarly Cormier was in a position to avoid the accident by preventing the limb from falling. The exceptions relating to the last clear chance doctrine are overruled.

The exception to the refusal to charge the emergency doctrine (*Bonenfant* v. *Hamel,* 96 N. H. 228; *Kardasinski* v. *Koford,* 88 N. H. 444) with respect to the conduct of Cormier is also

overruled. Cormier testified that he did not anticipate that the second limb would break. There was no evidence that he failed to take any action available to him after the emergency created by the breaking of the limb arose. *Frost v. Stevens*, 88 N. H. 164; *State* v. *Ouellette*, 98 N. H. 491. When the limb broke, Cormier was holding the rope with his left hand only, and so far as his testimony revealed, his conduct thereafter was unaffected by any stress of the occasion.

The defendant excepted to the receipt of testimony by the plaintiff that on other occasions when he had worked with Ralston crews when Cormier had been "topper," "he'd wait until I got cleaned out under the trees" before cutting another limb; and that there was an established custom or practice in the Haverhill area at the time "for the man in the tree to wait for the man on the ground to get his stuff cleared up." This testimony was properly received in the Court's discretion. Proof of practice or custom is not restricted to proof by evidence of conduct on prior similar occasions (2 Wigmore, Evidence (3d *ed.*) s. 379) as defendant's argument implies, but may also be by testimony of a witness as to his conclusions as to what the practice was. McCormick, Evidence, *p.* 343; 7 Wigmore, Evidence (3d *ed.*) *s.* 1954, *p.* 84.

The testimony of the foreman Beauvais to which exception was taken went no farther in establishing custom than to state what the demands of reasonable care would require regardless of custom, namely that a "topper" is "supposed to look down and see that nobody is under the tree until he sees everything is safe under the tree before he cuts the limb." The exceptions to the receipt of evidence of custom are overruled.

The defendant took certain exceptions to the plaintiff's examination of Cloutier with respect to his statements made in his deposition quoted above. It also excepted to the allowance of argument to the jury by plaintiff's counsel that Cloutier had said he was sawing "fifteen seconds" after the plaintiff started his power saw. This was not a "flagrant misstatement of the evidence" as defendant argues, but rather a permissible inference which counsel could properly draw from the testimony. There was no error in the rulings.

Other exceptions to evidentiary rulings require no discussion and are likewise overruled. The argument to the jury that Cormier tried to "save a piece of unimportant rope" was in our judgment

within the bounds of permissible argument and exception to its allowance is also overruled.

The defendant argues that its seventeenth and eighteenth requests for instructions were erroneously denied. No exception was preserved to denial of the seventeenth request, and the eighteenth, to the effect that the defendant was not required to anticipate that the plaintiff would voluntarily leave a place of safety to enter one of danger was adequately covered by the instructions given, which did not emphasize particular aspects of the evidence. As previously stated, there was no error in denial of the twentieth request for instructions submitting the emergency doctrine.

The jury was instructed that if the plaintiff's negligence was "a proximate cause" of his injury he could not recover, but that if it was not then he would not be legally at fault. The Court had previously defined "proximate cause" as a "direct cause" which need not be "the sole cause of the accident but it is sufficient if it was a concurring cause from which the result is a direct consequence." The jury was told: "If a person is legally at fault to any extent however slight, that is sufficient to make him chargeable with legal fault in determining the question of liability." The defendant excepted to the charge on the ground that "negligence may not be the proximate cause of the accident but if the negligence of the plaintiff however slight . . . caused or contributed to the cause of the accident he could not recover." We do not consider the instructions given to be comparable to those held to have been misleading in *Hanson* v. *Railway*, 73 N. H. 395. In the case at hand, the Trial Court adequately explained what was meant by "a proximate cause" as used in the charge, and as thus defined the expression had no tendency to mislead the jury in the respect complained of, whatever the risk of its use might be without such adequate explanation.

The argument that the Trial Court erred in its instruction to the effect that the jury must find that the plaintiff had proved "all of the elements" of the last clear chance doctrine in order to have its benefits, instead of charging that the jury must find that he had proved "each element" of the doctrine, requires no discussion. *Brown* v. *Gottesman*, 103 N. H. 33, 36-37.

*Judgment on the verdict.*

All concurred.