**362 A.2d 759.**

STATE *vs.* LOUIS A. CAMERLIN.

AUGUST 19, 1976.

PRESENT: Bevilacqua, C.J., Paolino, Joslin, Kelleher and Doris, JJ.

KELLEHER, J. A Superior Court jury found the defendant guilty of a charge that he committed an assault with the intent to murder. The assault took place on the evening of March 27, 1973 in the library of the Adult Correctional Institutions. The victim was Michael Ferreira. Both he and the defendant were serving prison sentences at the time. Sometime after the return of the guilty verdict, the trial justice denied the defendant's motion for a new trial and imposed a 20-year sentence. In his appeal, the defendant claims that the trial justice erred in ruling on several evidentiary matters and in denying his motion for a new trial.

The bulk of the testimony supporting the prosecution's case was given by three witnesses—the victim, a prison guard, and a nurse at the prison hospital. The victim testified that shortly after his arrival in the library, he

noticed that Camerlin and several other inmates were standing opposite him. He told the jury that he felt as if they were "clocking"[1] him and, to avert their stares, he turned around and started to gaze out a window. Within seconds, he said, someone came alongside him and, as he turned to see who it was, he saw Camerlin standing 2 feet to his rear with a ground-down screwdriver in his hand. According to Ferreira, Camerlin then lunged at him stabbing him in the back just below the right shoulder. Upon being struck, Ferreira grasped one of the bars covering the window but gave no outcry. After Camerlin withdrew the screwdriver, he concealed it in his trousers. Ferreira left the library and returned to his cell. Shortly thereafter, he was taken to the prison hospital. Earlier in the evening, Ferreira had refused to purchase marijuana for Camerlin, and Camerlin in return became angry and swore at him.

The guard reported that while on duty in the library he observed Ferreira, Camerlin, and his companions enter the library on the night of the incident. The guard believed that Camerlin's group was "clocking" him, and he left his post to telephone his supervisor. Upon his return some 5 minutes later, he saw Ferreira leaving the library area. Following Ferreira were Camerlin and his associates. As Ferreira passed the guard, he told the officer to "watch my back," but at no time did Ferreira tell the guard that he was injured.

The nurse testified that following Ferreira's admittance to the prison hospital, he was transferred to the State Medical Center, and from there, was brought to St. Joseph's Hospital. He described Ferreira's difficulty as a puncture

---

[1] According to Ferreira, "clocking" is a term used by inmates at the Adult Correctional Institutions which means that one individual is peering at another.

wound just below the right shoulder, internal bleeding, and a possible collapsed lung.

Camerlin's defense was that of an alibi. Several witnesses testified that at the time of the stabbing Camerlin was not in the library, but rather was with them in another area of the prison. Three of the inmates who were identified as being with Camerlin in the library when the stabbing occurred testified that Camerlin was not with them in the library. Another alleged companion of Camerlin indicated that while he (the companion) had been in the library, he left sometime prior to the stabbing.

Camerlin first contends that the trial justice erred when she permitted the victim to testify as to what a doctor told him regarding his condition and to his description of the treatment he received while at St. Joseph's Hospital. In response to certain questions posed by the prosecutor, Ferreira told the jury that while being treated at the Medical Center the doctor informed him that he was bleeding internally and had a collapsed lung. Later, when asked about his treatment at St. Joseph's Hospital, Ferreira responded by first describing the procedure whereby a tube was inserted in his chest, and then he said: "Supposedly, this tube was to expand my lung and supposedly, a drainage, or something." The trial justice denied the defense motion to strike the evidence relating to the internal bleeding, the collapsed lung, and the purpose for the tube's insertion. The motion to strike should have been granted.

Long ago, this court ruled that permitting a patient to report the diagnosis given by his attending physician runs afoul of the rules that bar the use of hearsay and a nonexpert from giving expert testimony. *Stuckey* v. *Rhode Island Co.*, 42 R. I. 450, 452-53, 108 A. 581, 582-83 (1920). While the trial justice erred, the denial of the motions to strike was not prejudicial. The responses were pure-

ly cumulative in the light of other evidence that was presented to the jury. The other evidence is found in the hospital records which indicate that the assault victim suffered a puncture wound and that he had a 10 percent collapse of his right lung. The nurse testified that the weapon penetrated the lung and caused internal bleeding. Consequently, since there was other probative evidence on the same issues to which the erroneously admitted evidence related, the errors complained of were harmless. *State* v. *Duffy*, 112 R. I. 276, 283, 308 A.2d 796, 800 (1973); *State* v. *Bennett*, 92 R. I. 316, 168 A.2d 282 (1961); *State* v. *Esposito*, 73 R. I. 94, 54 A.2d 1 (1947).

During his testimony, the prison nurse informed the jury that Ferreira received "a puncture wound of [the] right scapula area" which caused internal bleeding. He also went on to explain to the jury that since he could not detect any "lung sounds," he suspected that the victim had a collapsed lung. He also told the factfinders that a pneumothorax, or collapsed lung, was a serious condition because it carried with it the risk of death. Camerlin now argues that this testimony should have been stricken because the nurse did not have the requisite competence to bring these matters to the jury's attention.

In the recent cases of *State* v. *Capone*, 115 R. I. 426, 347 A.2d 615 (1975), and *State* v. *Cochrane*, 114 R. I. 710, 339 A.2d 256 (1975), we stated that the issue of whether a witness may testify as an expert on a particular subject is left to the sound discretion of the trial justice, and this court will not overturn his determination unless he has abused this discretion. It is clear from the record that the trial justice permitted the nurse to testify to his examination of Ferreira only after a proper evidentiary foundation had been laid.

The witness told the jury that he had been practicing his profession since he graduated in 1955 from nursing

school. Prior to that date, he had served in the armed forces in various medically related positions. At the time of trial, the witness had been working as a nurse at the Adult Correctional Institutions for 5 years. We have consistently held that a witness may qualify as an expert based upon his practical experience. *State* v. *Wilbur*, 115 R. I. 7, 339 A.2d 730 (1975); *Anderson* v. *Friendship Body & Radiator Works, Inc.*, 112 R. I. 445, 311 A.2d 288 (1973); *State* v. *Tutalo*, 99 R. I. 14, 205 A.2d 137 (1964). The nurse's years of experience, plus his academic training, equipped him to deal with a variety of physical ailments, and he was capable of testifying to matters in his field. The trial justice carefully restricted the nurse's testimony to matters which she felt were within his knowledge and experience. The nurse was limited to explaining physical symptoms that he had personally observed and basic anatomical facts within the understanding of a person having his expertise. The restraint used by the trial justice is illustrated by the fact that she specifically refused to allow the nurse to express an opinion on the length of the blade used upon Ferreira. On this facet of the appeal, we see no abuse of discretion.

During cross-examination, the guard replied in the negative when asked if Ferreira had identified his assailant. Thereafter, on redirect, the prosecutor asked the witness if he was surprised by the victim's failure to reveal the identity of the individual who wielded the weapon. The guard, over defense objection, told the jury that he was not surprised because whenever an inmate "* * * gets stabbed, or banged out, or something like that, they'll never tell because they run scared. They will never tell you who did it." The defense contends that this response amounts to an inadmissible opinion which is based upon pure speculation. The prosecution, on the other hand, describes the guard's response as an expert opinion given

by one whose specialized knowledge comes as a result of skills obtained by on-the-job training.

We will not categorize this portion of the record as opinion testimony. The guard was testifying about an observable fact of life in the prison or, if you will, jailhouse habit or custom reflected in the conduct of the inmates. This type of evidence is usually admissible for the purpose of showing the possible influence a particular situation has on an individual by reference to how others respond to similar conditions. *Wesson* v. *United States,* 164 F.2d 50 (8th Cir. 1947); *Eamiello* v. *Piscitelli,* 133 Conn. 360, 51 A.2d 912 (1947); *Sayers* v. *Ralston Tree Serv.,* 104 N. H. 433, 189 A.2d 480 (1963); *see* 2 Wigmore, *Evidence* §461 (3d ed. 1940). The usual objection lodged against the use of custom or habit testimony is irrelevancy. No such ground was asserted at trial. Here, the inquiry was relevant because the issue of the victim's silence arose during cross-examination, and it was proper that the prosecutor seek an explanation of the victim's post-assault silence. *State* v. *Mastracchio,* 112 R. I. 487, 495, 312 A.2d 190, 195 (1973); *State* v. *Bruni,* 79 R. I. 311, 88 A.2d 162 (1952).

Finally, the defense contends that the trial justice, in considering his motion for a new trial, failed to exercise her independent judgment as she proceeded to review the evidence adduced at trial. As the trial justice pointed out, the issue to be resolved at trial was quite simple. The jury was given a choice. It could either believe Ferreira when he said he was stabbed by Camerlin, or it could believe the many defense witnesses who testified that when the stabbing took place, Camerlin was in another part of the prison compound.

Although the trial justice did, indeed, refer at times to certain testimony and its possible effect upon the jurors' minds, she did go on and detail the facts as she saw them.

She pointed out that Ferreira's version of the library assault was corroborated by the guard's testimony. She also described the testimony given by the alibi witnesses as incredible and alluded to the fact that the testimony given by these witnesses conflicted in several respects. It is obvious to us that the trial justice did in fact exercise her independent judgment, as she must, when she considered the credibility of the witnesses and the weight of the evidence. Although the trial justice did not give an extended discussion of the evidence presented at trial, there is no necessity that she do so. *State* v. *Tate,* 109 R. I. 586, 588-89, 288 A.2d 494, 496 (1972). The trial justice, as did the jury, elected to believe the prosecution's version of what went on during the guard's absence from his post in the library. We see no reason to fault her choice. The defense has failed to sustain its burden of persuading us that, in her consideration of the new trial motion, the trial justice overlooked or misconceived material evidence on a controlling issue, or was otherwise clearly wrong. *State* v. *Jefferson,* 116 R. I. 124, 130, 353 A.2d 190, 194 (1976); *State* v. *Howard,* 114 R. I. 731, 339 A.2d 259 (1975); *State* v. *Lima,* 113 R. I. 6, 316 A.2d 501 (1974).

The defendant's appeal is denied and dismissed.

*Julius C. Michaelson,* Attorney General, *Richard B. Woolley,* Special Asst. Attorney General, for plaintiff.

*William F. Reilly,* Public Defender, *Benedetto A. Cerilli,* Asst. Public Defender, for defendant.